IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| LUMINATI NETWORKS LTD., § § *Plaintiff*, § § v. § § NETNUT LTD., § § *Defendant*. § | § § § § § Case No. 2:20-cv-00188-JRG-RSP § § § § |

### REPORT AND RECOMMENDATION

Before the Court is Defendant NetNut Ltd.'s Motion for Summary Judgment of Noninfringement. **Dkt. No. 120**. Defendant's Motion requests summary judgment that NetNut has not infringed U.S. Patent Nos. 10,484,511 (the "'511 Patent") or 10,637,968 (the "'968 Patent") since December 21, 2020, when it moved its proxy servers outside of the United States, and that NetNut has never infringed the '511 Patent. *Id.* at 4.

### I.   BACKGROUND

Plaintiff Luminati, Ltd., now Bright Data, Ltd. ("Luminati") asserts two patents in this case: U.S. Patent Nos. 10,484,511 (the "'511 Patent") and 10,637,968 (the "'968 Patent"). Dkt. No. 1 at 17–25. Each patent contains only method claims. Dkt. No. 1-1 at 29–30; Dkt. No. 1-2 at 29–30.

Luminati asserts that the '511 Patent and the '968 Patent claim methods for use in a client device, server, and web server architecture. The methods of the '968 Patent claims are performed by the client device and the methods of the '511 Patent claims are performed by the server. Dkt. No. 120 at 4; Dkt. No. 139 at 5. Luminati asserts that the "first server" of the '511 Patent and the "second server" of the '968 Patent are each met by a NetNut proxy server, also called a Squid server. Dkt. No. 120 at 5; Dkt. No. 139 at 5.

1

On December 21, 2020, NetNut moved its proxy servers outside of the United States. Dkt. No. 120 at 4; *see* Dkt. No. 139 at 10–11. The parties' first dispute in NetNut's Motion is that NetNut argues that it has not actionably infringed the '511 Patent or the '968 Patent since that date because allegedly infringing steps were performed by those servers, and thus outside of the United States.

On February 27, 2021, the Court granted a joint motion to adopt the claim construction order from *Luminati Networks Ltd. v. Code200, UAB et al.*, Case No. 2:19-cv-00396-JRG ("*Code200*"). Dkt. No. 68; *see Code200*, Dkt. No. 97 ("Claim Construction Order") (E.D. Tex. Feb. 8, 2021). The parties' second dispute in this Motion is whether Dr. Rhyne has provided an opinion regarding a certain claim element that is sufficient to create a genuine dispute of fact regarding infringement..

## II.     LEGAL STANDARDS

### A. Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any evidence must be viewed in the light most favorable to the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when there is no genuine dispute of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. The substantive law identifies the material facts, and disputes over facts that are irrelevant or unnecessary will not defeat a motion for

summary judgment. *Id.* at 248. A dispute about a material fact is "genuine" when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party must identify the basis for granting summary judgment and evidence demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. "If the moving party does not have the ultimate burden of persuasion at trial, the party 'must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.'" *Intellectual Ventures I LLC v. T Mobile USA, Inc.*, No. 2:17-CV-00577-JRG, 2018 WL 5809267, at *1 (E.D. Tex. Nov. 6, 2018) (quoting *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000)).

### B. Infringement

Determining whether a product or method literally infringes a patent is a two-step process. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1319 (Fed. Cir. 2012). The Court must first determine the proper construction of the asserted claims, which is a matter of law. *Id.* At the second step, the finder of fact must determine whether the asserted claim, as properly construed, "reads" on the product or method. *Id.* In other words, "a patentee must supply sufficient evidence to prove that the accused product or process contains . . . every limitation of the properly construed claim." *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1328 (Fed. Cir. 2019) (quoting *Seal-Flex, Inc. v. Athletic Track and Court Const.*, 172 F.3d 836, 842 (Fed. Cir. 1999)).

Infringement may be found only where the accused product or process contains each claim limitation, either literally or under the doctrine of equivalents. 35 U.S.C. § 271. To infringe a method claim, a person must have practiced all steps of the claimed method in the United States.

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009); *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317–18 (Fed. Cir. 2005).

### III. ANALYSIS

#### A. '511 Patent Infringement After Server Relocation

NetNut asserts that Luminati does not dispute NetNut's noninfringement of the '511 Patent after December 21, 2020. Dkt. No. 120 at 7 (citing *supra* § II ¶ 9 (citing Dkt. No. 120-3 ¶ 125, 132, 135)). Luminati confirms that it "has never accused NetNut's proxy servers that are located outside of the United States of infringement of the '511 Patent," but argues that "[c]ourts do not grant summary judgment of non-infringement by unaccused products." Dkt. No. 139 at 10 (citing *In re Katz Interactive Call Processing Patent Litig.*, No. MDL 2:07-ML-1816-C-RGK (FFMx), 2010 U.S. Dist. LEXIS 144766, at *162 (C.D. Cal. Dec. 3, 2010)).

Luminati argues that summary judgment on this issue should not be granted "because there is no case or controversy required for the Court to hear such a dispute." *Id.* (citing U.S. Cost. Art. III, § 2). Luminati contends that claims for non-infringement can only be based on justiciable controversies. *Id.* (citing *Medimmune, Inc. v. Genenetech, Inc.*, 549 U.S. 118, 127 (2007)). Finally, Luminati argues that the party asserting the right to adjudication bears the burden of proving that a justiciable controversy existed when the action was filed and has continued since. *Id.* (citing *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007); *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1337 (Fed. Cir. 2008)).

NetNut replies that Luminati's assertion that it "has never accused NetNut's proxy servers that are located outside of the United States of infringement of the '511 Patent" is not true. Dkt.

4

No. 158 at 4 (quoting Dkt. No. 139 at 10). NetNut quotes Luminati's March 2021 contentions, which Dr. Rhyne incorporated by reference:

> [T]he Accused Instrumentalities include a first server . . . which even if it is located outside of the United States still infringes this claim pursuant to 35 U.S.C. § 271(g) as the Accused Instrumentalities are directed toward use by customers/client devices in the United States . . . .

*Id.* at 4–5 (quoting Dkt. No. 158-1 at 3–4). NetNut continues, "[t]his is despite two letters from NetNut asking Luminati to "promptly let us know if Luminati is still claiming that there is ongoing infringement . . ." and asking for "a mutual stipulation . . . in order to avoid needless cost and burden litigating issues that are demonstrably moot." *Id.* at 5 (quoting Dkt. No. 158-2 at 2; citing Dkt. No. 128-4).

Luminati replies that "NetNut's reference to an early paragraph of Bright Data's March 29, 2021 infringement contentions that was repeated from its prior September 9, 2020 contentions -- which Bright Data intended to apply to the system as it existed before December 4, 2020 -- fails to establish an issue appropriate for summary judgment." Dkt. No. 194 at 4. Luminati does not contest that this paragraph is present or says what it says, merely that it "was repeated from its prior September 9, 2020 contentions . . . ." *See Id.*

Regardless of whether the presence of this paragraph was a typographical error or not, it is present. Accordingly, there is an allegation that "the Accused Instrumentalities include a first server . . . which even if it is located outside of the United States still infringes this claim . . . ." *See* Dkt. No. 158-1 at 3–4. Accordingly, NetNut has met its burden to establish a justiciable controversy, and summary judgment should be granted as to infringement after December 21, 2020.

5

### B.  '968 Patent Infringement After Server Relocation

NetNut argues that claim 1 of the '968 Patent requires actions occurring outside of the United States as the claim requires actions by the "second server." Dkt. No. 120 at 8. NetNut's argument centers on two points. *Id.* at 8–9.

First, NetNut notes the last element of the claim recites "receiving, by the requesting client device, over the Internet in response to the sending, from the second server **using the selected IP address**, the first content." *Id.* at 8 (quoting Dkt. No. 1-2 at 19:33–35) (emphasis added in Dkt. No. 120). NetNut argues that under Luminati's infringement theory, the "using the selected IP address" functionality is met exclusively by actions of the "second server." *Id.*

Second, NetNut argues that the claim requires that its method is "for use with a second server" and the method is performed by both the "second server" and the "requesting client device" by the plain claim language. *Id.* at 9. NetNut asserts that the Court has construed the preamble of the claim to be limiting. *Id.* (citing *supra* § II ¶ 12 (citing Dkt. No. 68 (adopting Claim Construction Order from *Code200*).

With respect to the second argument, NetNut's argument about the claim's preamble is misleading. The Court construed the preamble of the claim to be limiting, but with no further analysis of the preamble as a whole because the parties agreed to the construction that the preamble as a whole is limiting. Claim Construction Order at 10. However, as Luminati counters in its reply, the Court analyzes and construes a section of the preamble regarding "a first web server." *See* Dkt. No. 139 at 12; *see also* Claim Construction Order at 27–29.

For context, the preamble of claim 1 of the '968 Patent provides as follows:

> A method for use with a requesting client device that comprises an Hypertext Transfer Protocol (HTTP) or Hypertext Transfer Protocol Secure (HTTPS) client, **for use with a first web server that is a HTTP or HTTPS server that respectively responds to HTTP or HTTPS requests and stores a first content identified by a first content identifier**, for use with a second server distinct from the first web server and identified in the Internet by a second IP address, and for use with a list of IP addresses, the method comprising:

Dkt. No. 1-2 at 19:16–24 (emphasis added). This is a method claim for use with (1) a requesting client device, (2) a first web server, (3) a second server, and (4) a list of IP addresses. *Id.* The four primary steps of the method claim are conducted "by the requesting client device . . . ." *Id.* at 19:25–35. The Court construed the preamble as limiting just as parties agreed. Claim Construction Order at 10. Within the preamble, the parties disputed the term emphasized above, "for use with a first web server that is a HTTP or HTTPS server that respectively responds to HTTP or HTTPS requests and stores a first content identified by a first content identifier." Claim Construction Order at 27–29.

Analyzing this term, the Court reasoned:

> The issue in dispute distills to whether the body is required to state an affirmative role for the "first web server" recited in the preamble for the claim to be definite. It is not. The "first web server" is an environmental limitation. The Federal Circuit "distinguish[es] between those limitations that describe the environment in which a claim operates from the limitations that must be performed by an accused infringer." *Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1375 (Fed. Cir. 2011). *Advanced Software* held that claims directed to validating a financial instrument having encrypted information in which the method of encryption is defined in the preamble may be infringed without performing the encryption method. But the claims will not be infringed if the instrument that is validated has not been "encrypted . . . in accordance with steps described in the preamble." *Id.* at 1373–75. Thus, the environment in Advanced Software, namely, the encrypted information specified in the preamble, was a limitation of the claim but did not create, or require, an affirmative step relating to encrypting the information. Similarly, the "first web server that . . . stores a first content identified by a first content identifier" limitation recited in the

7

> preamble here defines, in part, the environment in which the recited steps must be performed by the requesting client device. The claim does not require an affirmative step by the web server.

Claim Construction Order at 28–29. This construction was issued to resolve an indefiniteness dispute. *Id.* The Court did not construe the other term of the preamble, "a second server distinct from the first web server and identified in the Internet by a second IP address."

Luminati argues that "[t]he recitation of a 'second server' and a 'first web server' in the preamble are environmental and do not require actions in steps of the claim." Dkt. No. 139 at 12. This is where Luminati's argument unwinds: as NetNut argued in its first point, the last element of the claim recites "receiving, by the requesting client device, over the Internet in response to the sending, from the second server **using the selected IP address**, the first content." *See* Dkt. No. 120 at 8 (quoting Dkt. No. 1-2 at 19:33–35) (emphasis added in Dkt. No. 120).

While the "receiving" is completed "by the requesting client device," this receiving is "in response to the sending . . . the first content," wherein the sending is "from the second server using the selected IP address." *See Id.* NetNut argues that the required "using the selected IP address" functionality is met exclusively by actions of the "second server," i.e., a NetNut proxy server under Luminati's infringement theory. Dkt. No. 120 at 8. The Court agrees that the verb "using" is an action of the "second server." Furthermore, the Court also finds that the verb "sending" is an action of the "second server" as well. This "sending" must be completed by the "second server" for the "requesting client device" to "receiv[e]" "in response to the sending." *See* Dkt. No. 1-2 at 19:33–35.

It is in this way that the "second server" is distinct from the "first web server:" there are required actions by the "second server" within the larger steps by "the requesting client device" in the claim, but there are no such actions by the "first web server." Accordingly, while the "first web

8

server" is an environmental limitation, the "second server" is not: the second server must "us[e] the selected IP address" and "send . . . the first content."

The Court is not the first court to make such a finding for a computer-network method claim. NetNut argues that the issue here is comparable to a dispute in *Acceleration Bay LLC v. Electronic Arts Inc.* Dkt. No. 120 at 9–11 (citing *Acceleration Bay LLC v. Electronic Arts Inc.*, No. 1:16-cv-00454-RGA, 2019 WL 1376036, at *5 (D. Del. Mar. 27, 2019)). NetNut provides a comparison of that claim and claim 1 of the '968 Patent with colored annotations:

| *Acceleration Bay*, Claim 1, '069 Patent | Claim 1, '968 Patent |
|---|---|
| A computer-based, non-routing table based, non-switch based method for adding a participant to a network of participants, each participant being connected to three or more other participants, the method comprising: **identifying a pair of participants** of the network that are connected wherein a seeking participant contacts **a fully connected portal computer**, which in turn **sends an edge connection request** to a number of randomly selected neighboring participants to which the seeking participant is to connect; **disconnecting the participants** of the identified pair from each other; and **connecting each participant** of the identified pair of participants to the seeking participant. | A method for use with a requesting client device that comprises an Hypertext Transfer Protocol (HTTP) or Hypertext Transfer Protocol Secure (HTTPS) client, for use with a first web server that is a HTTP or HTTPS server that respectively responds to HTTP or HTTPS requests and stores a first content identified by a first content identifier, **for use with a second server** distinct from the first web server and identified in the Internet by a second IP address, and for use with a list of IP addresses, the method comprising: **identifying, by the requesting client device**, an HTTP or HTTPS request for the first content; **selecting, by the requesting client device**, an IP address from the list; **sending, by the requesting client device**, to the second server using the second IP address over the Internet in response to the identifying and the selecting, the first content identifier and the selected IP address; and **receiving, by the requesting client device**, over the Internet in response to the sending, from the second server **using the selected IP address**, the first content. |

*Id.* at 10 (citing *Acceleration Bay LLC*, 2019 WL 1376036, at *5). In *Acceleration Bay*, the claim language both parties agreed formed steps in the claim are shown in blue and the limitations the defendant argued are part of the steps are shown in green. *Id.* (citing *Acceleration Bay LLC*, 2019 WL 1376036, at *5). NetNut makes similar annotations to claim 1 of the '968 Patent. *Id.*

In *Acceleration Bay*, the court found that the "Plaintiff's distinction between steps and parts of steps is unsupportable." *Acceleration Bay LLC*, 2019 WL 1376036, at *5. Quoting *NTP*, the court stated that "[t]he Federal Circuit is clear that a 'patent for a method or process is not infringed unless all steps or stages of the claimed process are utilized.'" *Id.* (quoting *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005) (abrogated on other grounds by *Avid Technology, Inc. v. Harmonic, Inc.*, 812 F.3d 1040 (Fed. Cir. 2016))).

Luminati argues that *NTP* is inapposite because "[i]n *NTP* . . . the asserted method claims recited a step that utilizes an 'interface' or 'interface switch' satisfied by RIM's Relay located in Canada. Unlike the 'interface'/'interface switch' limitations in NTP, the 'second server' . . . is recited as an environmental limitation only without requiring an affirmative step." Dkt. No. 139 at 13. Luminati further argues that *Acceleration Bay* is distinguished from the present issue as the portion of the claim in *Acceleration Bay* clearly recites an affirmative step while the "second server" does not perform an affirmative step. The Court disagrees. The "using" and "sending" in the "receiving" step are affirmative steps.

Accordingly, the "second server" is not merely an environmental limitation, but rather an active one due to the affirmative steps it performs. Since there is no factual dispute that the instrumentalities accused of being the "second server" were moved out of the United States on December 21, 2020, there can be no infringement of the '968 Patent by the Accused Instrumentalities after that date.

### C. '511 Patent "Selecting, in Response to . . ." Literal Infringement

NetNut asserts that Luminati provides no theory or evidence that the accused NetNut service meets the requirement in claim 1 of the '511 Patent of "selecting, in response to the receiving of the first content identifier from the first client device, an IP address from the group." Dkt. No. 120 at 11. NetNut states that Dr. Rhyne, Luminati's technical expert, testified that the required "in response to" element means that "a content identifier comes from the first client device to the first server. And it **uses that**, at least in part, **to select an IP address** from the group of IP addresses that are available at that server." *Id.* at 11–12 (quoting Dkt. No. 120-8 at 63:13–19) (emphasis in NetNut's Motion). NetNut argues that Dr. Rhyne's infringement analysis "falls indisputably short of what he believes the claim to mean" and discusses an alleged inconsistency with Dr. Rhyne's mapping of functions. *Id.* at 12.

NetNut asserts that Dr. Rhyne "maps the selection of an IP address to the function 'getOutgoingAddress'" *Id.* (citing Dkt. No. 120-3 at ¶¶ 114–15). NetNut contends that Dr. Rhyne then "maps the processing of a content identifier to a different function: 'processParsedRequest.'" *Id.* (citing Dkt. No. 120-3 at ¶ 116). NetNut argues, "Dr. Rhyne not only fails to identify the portion of the 'getOutgoingAddress' function that uses a content identifier but also admits that the process of selecting an IP address has "already happened" before a content identifier is processed." *Id.* (citing Dkt. No. 120-8 at 99:19–102:7). NetNut concludes, "[a]ccordingly, at least because the IP address is selected **before** the content identifier is processed, the server does not **use the content identifier**, at least in part, to **select an IP address** as Dr. Rhyne understands the claim to require." *Id.* (citing Dkt. No. 120-8 at 63:13–19) (emphasis in original).

11

Luminati responds that NetNut's argument is based on a mischaracterization of Dr. Rhyne's testimony to argue that "selecting, in response to the receiving of the first content identifier from the first client device, an IP address from the group" must mean "[t]he first server uses that content identifier, at least in part, to select an IP address" when it actually means "that the first server uses receipt of the first content identifier to select an IP address (not that it must use the content identifier itself to select an IP address)." Dkt. No. 139 at 15–16. Luminati argues that NetNut's argument regarding the "getOutgoingAddress" function is faulty as the claims do not require using the content identifier but rather selecting, in response to receiving the content identifier, an IP address from a group. *Id.* at 16.

This dispute centers around Dr. Rhyne's deposition testimony. When asked "what does it mean to be in response to receiving the first content identifier from the first client device?" Dr. Rhyne answered "It's exactly that, that a content identifier comes from the first client device to the first server. And it uses *that*, at least in part, to select an IP address from the group of IP addresses that are available at that server." Dkt. No. 139-5 at 63:10–19 (emphasis supplied). The dispute revolves around what the first "that" in Dr. Rhyne's second sentence points to: "a content identifier" or "that a content identifier comes from the first client device to the first server."

NetNut argues that it is the former and that Luminati attempts to change Dr. Rhyne's testimony to use "receipt of the first content identifier" rather than the first content identifier itself. Dkt. No. 158 at 6. Luminati argues that it is the latter and that NetNut relies on mischaracterizing Dr. Rhyne's deposition testimony to rewrite claim 1 of the '511 Patent to support its non-infringement argument. Dkt. No. 194 at 6–7. NetNut argues that Dr. Rhyne nowhere opines how the server uses the content identifier to select an IP address. Dkt. No. 120 at 12. Luminati argues that Dr. Rhyne doesn't need to do that because the claims do not require using the content identifier

but rather selecting, in response to receiving the content identifier, an IP address from a group. Dkt. No. 139 at 13.

With respect to how the claim reads, Luminati is correct. NetNut's argument that Dr. Rhyne needs to show how the content identifier itself is used is faulty because that is not what the claim requires. The claim provides, "selecting, **in response to the receiving** of the first content identifier from the first client device, an IP address from the group . . . ." Dkt. No. 1-1 at 19:22–24 (emphasis added).

NetNut argues that summary judgment would still be appropriate even under Dr. Rhyne's "modified" testimony. Dkt. No. 158 at 6. NetNut contends that Luminati never explains how receipt of the first content identifier is used to select an IP address in its contentions or Dr. Rhyne's report and it "cannot do so because, as Dr. Rhyne testified, the IP address is already selected before any received content identifier is processed." *Id.* (citing Dkt. No. 120 at 12).

Luminati argues that this section of Dr. Rhyne's testimony concerns the '968 Patent, not the '511 Patent. Dkt. No. 139 at 16 (citing Dkt. No. 139-4 ¶¶ 105, 106, § 8.1.1). NetNut counters that Luminati attempts to create a dispute about which patent Dr. Rhyne was discussing . . . Dr. Rhyne was talking about the accused products, not one of the patents." Dkt. No. 158 at 6 (citing Dkt. No. 120 at 12). NetNut is, with respect to the characterization of Dr. Rhyne's report here, correct. The cited sections of Dr. Rhyne's report discuss the accused instrumentalities and how they operate. Dkt. No. 139-4 at 10–13. Whether this discussion is directed to establishing infringement of one patent or the other is irrelevant, it is an opinion about the same Accused Instrumentalities.

However, NetNut merely presents attorney argument about the credibility Dr. Rhyne's testimony. Such an issue is properly addressed through cross examination. For purposes of a

motion for summary judgment, Luminati must merely point to evidence that supports its infringement theory. Luminati has done so.

Luminati further argues that Dr. Rhyne has identified several ways for users of the Accused Instrumentalities to access NetNut's proxy services for making content requests. Dkt. No. 139 at 16. Luminati contends, "[i]n one example, a 'Proxy API receives content requests from users,' and '[i]n response to receiving a content request with a content identifier, the Proxy API selects a proxy server and establishes a proxy server connection through which the content request is made to the content server.'" *Id.* at 16–17 (quoting Dkt. No. 139-4 ¶ 99).

NetNut argues that "this paragraph cites no evidence for support. Unsupported expert testimony cannot avoid summary judgment." Dkt. No. 158 at 7 (citing *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000)). However, this paragraph actually provides:

> As another example, users of the Accused Instrumentalities may access Defendant's proxy services by using the NetNut-provided Proxy API. The Proxy API is described in a document produced at Bates numbers NETNUT00000013-17. An introductory description of the Proxy API at NETNUT00000013 is copied below. The Proxy API receives content requests from users. In response to receiving a content request with a content identifier, the Proxy API selects a proxy server and establishes a proxy server connection through which the content request is made to the content server. A response including the requested content is then returned by the content server to the proxy server, and the proxy server returns this content back to the user.

Dkt. No. 139-4 ¶ 99. Dr. Rhyne's report cites to specific documents including Bates Numbers. *Id.* This is a sufficient response to the motion for summary judgment.

### D. '511 Patent "Selecting, in Response to . . ." DoE Infringement

NetNut also argues that Dr. Rhyne does not provide any doctrine of equivalence argument regarding the "in response to" requirement. Dkt. No. 120 at 12–13 (citing Dkt. No. 120-3 ¶ 124).

This argument is based upon NetNut's theory that the claims require use of the first content identifier and not the receipt of the first content identifier.

Luminati responds that Dr. Rhyne expressly opines that a person of ordinary skill in the art would understand that the various selections which may be made by NetNut's Squid server, that are "in response to a connection with a client device for reaching a web server," are the equivalent of "selecting an IP address in response to receiving a content identifier" as the difference is "insubstantial." Dkt. No. 139 at 18 (citing Dkt. No. 120-3 ¶ 124). The cited paragraph provides:

> Also, to the extent that the Squid Server selects a position or parameter associated with a list and/or selects an identifier in the list associated with prefixes in response to a connection with a client device for reaching a web server, in my opinion a POSA would understand this to be the equivalent of selecting an IP address in response to receiving a content identifier as the difference between those approaches is insubstantial. . .

Dkt. No. 120-3 ¶ 124.

NetNut argues this paragraph is legally insufficient to survive summary judgment because (1) it is boilerplate, (2) the argument addresses the claim as a whole rather than just the element of the claim he asserts has an equivalent, and that (3) this argument vitiates part of the claim element by effectively removing the "in response to" portion of the claim. Dkt. No. 158 at 7–8. NetNut's second and third arguments are incorrect: reading the paragraph in its entirety, it addresses each element of the claim that he asserts has an equivalent, including the "in response to" portion of the claim. Dkt. No. 120-3 at ¶ 124. Luminati's response to NetNut's boilerplate argument is merely that "Dr. Rhyne's analysis thoroughly considers the function, way, and result (which is clearly not boilerplate) . . . ." Dkt. No. 194 at 8.

NetNut argues that Dr. Rhyne's analysis is boilerplate because "Dr. Rhyne simply states that the function, way, and result is the same without any explanation of why. Courts have found

similarly conclusory statements on the doctrine of equivalents insufficient to survive summary judgment." Dkt. No. 158 at 7 (citing *Freight Tracking Techs., LLC v. Virginia Int'l Terminals, LLC*, No. 2:13-cv-708, 2015 WL 12672086, at *4 (E.D. Va. Aug. 7, 2015), *aff'd*, 653 F. App'x 759 (Fed. Cir. 2016)). In *Freight Tracking Technologies, LLC*, the Federal Circuit found an opening report that "contained only a few conclusory sentences regarding the doctrine of equivalents, and lacked particularized information regarding how and why the claim limitations were equivalent" was boilerplate insufficient for two reasons: because "it lacks the requisite particularity" and "Plaintiff cannot compensate for sparse testimony regarding the doctrine of equivalents by relying exclusively on testimony regarding literal infringement." *Freight Tracking Techs., LLC*, 2015 WL 12672086, at *4.

Here, Dr. Rhyne's doctrine of equivalents analysis is not merely boilerplate. *See* Dkt. No. 120-3 at ¶ 124. Dr. Rhyne's analysis provides as follows:

> Additionally, to the extent any step is not literally present in the Accused Instrumentalities, the Accused Instrumentalities would nevertheless infringe under the doctrine of equivalents, including as I explained in Exhibit H. For example, to the extent that the Squid Server selects a position or parameter associated with a list (e.g., selects the second position of a list of IP addresses), in my opinion a POSA would understand this selection to be the equivalent of selecting an IP address as the difference between those approaches is insubstantial. Selection of a position or parameter associated with a list of IP addresses, in my opinion, achieves substantially the same function, which is the selection of an IP address for use as a proxy to obtain web content. The selection is performed the same way in that either way the Squid Server selects by identifying an IP address. That selection occurs whether the Squid Server literally identifies an IP address by number or, for example, selects a position or address of a list of IP addresses that results in the IP address being used as a proxy. It also obtains substantially the same result, which is that a single IP address is identified and used by the system to carry out the request for web content as a proxy and then uses that same IP address to receive the content and transmit it such that the requesting party obtains the content without the web server receiving any identifying information of the requestor. Thus, in addition to the

16

> overall lack of any substantial difference in the selection process, in my opinion this method step is equivalent under the function-way-result test.

*Id.* The Court finds that Dr. Rhyne did provide sufficient analysis to form the basis for a doctrine of equivalents argument.

## IV. CONCLUSION

The Court **RECOMMENDS** that NetNut's Motion be granted-in-part that the Accused Instrumentalities do not infringe either the '511 or the '968 Patent after the December 21, 2020 server relocation. The Court further **RECOMMENDS** that NetNut's Motion be denied as to both literal infringement and infringement under the doctrine of equivalents of the '511 Patent on and prior to December 21, 2020.

A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within 14 days bars that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc). Any objection to this Report and Recommendation must be filed in ECF under the event "Objection to Report and Recommendations [cv, respoth]" or it may not be considered by the District Judge.

**SIGNED this 30th day of September, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

17